[Civ. No. 14902. Third Dist. Nov. 18, 1975.]

BOARD OF OSTEOPATHIC EXAMINERS et al.,
Plaintiffs and Respondents, v.
BOARD OF MEDICAL EXAMINERS et al.,
Defendants and Appellants.

COUNSEL

Evelle J. Younger, Attorney General, Talmadge R. Jones and Joel S. Primes, Deputy Attorneys General, for Defendants and Appellants.

Tobin & Gassner, Alexander R. Tobin and Lawrence M. Gassner for Plaintiffs and Respondents.

OPINION

**PARAS, J.**—The state Board of Medical Examiners appeals from a summary judgment of the Sacramento Superior Court finding a 1973 statute null and void, and enjoining the board from licensing any person to practice medicine pursuant to said statute.

The statute in question (Stats. 1973, ch. 1132, p. 2316) has not been codified.[1] For convenience, we shall refer to it by its Senate Bill number, "SB 1358." It was signed by the Governor on October 2, 1973, and became effective January 1, 1974. The issue on appeal is whether the Legislature had the power to enact it.

A brief historical review, although covered elsewhere (see *D'Amico v. Board of Medical Examiners* (1970) 6 Cal.App.3d 716, 721-723 [86 Cal.Rptr. 245]—hereinafter *"D'Amico I"*) is nonetheless appropriate here. The state Board of Medical Examiners (hereinafter "Medical Board") was established in 1907, composed of nominees of the various

---

[1] The statute reads in its entirety as follows:

"The Board of Medical Examiners of the State of California shall issue a physician's and surgeon's certificate to anyone who successfully passes a written and clinical examination and who meets all the following requirements:

"(a) Is a resident of California.

"(b) Is a graduate of a four-year college or university.

"(c) *Attended an out-of-state osteopathic school of medicine and obtained a doctor of osteopathic degree from such school.*

"(d) Has performed an internship in a hospital.

"(e) Has practiced as an osteopathic physician in another state for at least two years.

"(f) Has practiced as an osteopathic physician in the State of California at a federal institution for at least three years.

"(g) Has been licensed as an osteopathic physician and surgeon in at least five states.

"(h) Applies for the physician's and surgeon's certificate within 30 days from the effective date of this act.

"Sec. 2. This act shall be operative until December 31, 1975, and after that date shall have no force and effect." (Italics added.)

allopathic,[2] homeopathic,[3] osteopathic[4] and eclectic schools of medicine. Apparently under the 1907 act, and certainly under the 1913 act, osteopaths who could qualify were licensed to practice medicine and surgery.

However, by 1919, allopathic physicians had gained control of the Medical Board and it refused to examine any more graduates of osteopathic schools; it also withdrew its approval of the single osteopathic college in this state. The Medical Board's position was disapproved by the Court of Appeal in *College of Osteopathic Physicians & Surgeons* v. *Board of Medical Examiners* (1921) 53 Cal.App. 138, 139 [199 P. 1093], but tensions continued.

In 1922, the osteopaths succeeded in obtaining passage of an initiative measure which established an independent Board of Osteopathic Examiners (hereinafter "Osteopathic Board").[5] The result was that the Medical Board continued to issue the physician's and surgeon's certificate to graduates of medical schools with M.D. degrees, and the Osteopathic Board began to issue the identical physician's and surgeon's certificate to graduates of osteopathic schools with D.O. degrees, both under identical legislative standards of education and examination.

In 1961, the California Medical Association and the California Osteopathic Association signed an agreement which was intended to unify "the separate organizations which have heretofore existed in

---

[2]"Allopathy is an erroneous designation for the regular system of medicine and surgery. The term really means the curing of diseased action by inducing a different kind of action in the body." (Dorland, The American Illustrated Medical Dict. (21st ed. 1947) p. 75.)

[3]"Homeopathy is a system of therapy developed by Samual Hahnemann on the theory that large doses of a certain drug given to a healthy person will produce certain conditions which, when occurring spontaneously as symptoms of a disease, are relieved by the same drug in small doses. . . . a sort of 'fighting fire with fire' therapy. . . . The real value of homeopathy was to demonstrate the healing powers of nature and the therapeutic value of placebos." (Stedman's Medical Dict. (22d ed. 1972) p. 583.)

[4]"Osteopathy is a school of medicine based upon the idea that the normal body when in 'correct adjustment' is a vital machine capable of making its own remedies against infections and other toxic conditions. Practitioners use the diagnostic and therapeutic measures of ordinary medicine in addition to manipulative measures." (*Id.*, p. 899.)

[5]Since the Legislature has no power to codify initiative measures, this and later initiative acts modifying it are included in different places by the publishers of the codes. It is included as Appendix II to Deering's Annotated California Business and Professions Code, and as section 3600-1 et seq. in West's Annotated California Business and Professions Codes.

parallel structure . . . ." (*Osteopathic Physicians & Surgeons* v. *Cal. Medical Assn.* (1964) 224 Cal.App.2d 378, 397 [36 Cal.Rptr. 641].) For present purposes, it is sufficient to state that in general the agreement contemplated that all presently licensed D.O.s would become M.D.s subject to the jurisdiction of the Medical Board, in return for which no future D.O.s would be licensed in California, and the Osteopathic Board would ultimately cease to exist. In accordance with this agreement, the parties succeeded in obtaining passage of certain legislation.

First, section 2396 of Business and Professions Code was amended by the Legislature to provide that any licentiate of the Osteopathic Board who obtained a degree of "M.D." from a California Medical School before September 20, 1962, could elect to use the "M.D." designation, but thereafter his use of "D.O." would be unprofessional conduct. To implement this legislation, the agreement provided that arrangements be made for the College of Osteopathic Physicians and Surgeons to issue "M.D." degrees to "doctors of Osteopathy presently licensed as physicians and surgeons in the State of California," and for the college to change its name to delete the word "osteopathic." (See *Osteopathic Physicians & Surgeons* v. *Cal. Medical Assn., supra,* p. 392.) The osteopathic college, as a consequence, eventually became the University of California Medical School at Irvine.

Second, the initiative Osteopathic Act of 1962 (Stats. 1963, First Ex. Sess. 1962, ch. 48) was approved by the voters. This chapter amended the Osteopathic Act of 1922 to transfer licensing power over those converting from "D.O." to "M.D." to the Medical Board and to bar licensing of new osteopathic physicians and surgeons. Approximately 2,500 California "D.O.s" elected to become "M.D.s" and changed their licensing board pursuant to these provisions; since 1962 they have continued to be under the jurisdiction of the Medical Board.

In 1968, however, Dr. Theodore D'Amico and seven other osteopaths with out-of-state D.O. degrees filed suit against the Medical Board seeking to be licensed as physicians and surgeons. In *D'Amico I,* we held that the 1962 Osteopathic Act did in fact eliminate the licensure of new osteopaths, and we remanded the case for a factual determination relating to the constitutionality of that elimination. On remand (*D'Amico* v. *Board of Medical Examiners* (1974) 11 Cal.3d 1, 23 [112 Cal.Rptr. 786, 520 P.2d 10]—hereinafter *D'Amico II*), the Board of Medical Examiners stipulated "(1) that osteopathy, like allopathy, is a complete school of

medicine and surgery whose practitioners successfully engage in the full range of activities commonly thought of as constituting medical science, including manipulation, treatment by drugs, operative surgery and physical therapy, and (2) that there exists in the state examining and licensing boards the technical capacity to screen osteopathic applicants for licensure, as allopathic applicants are now screened, so as to insure that the people of the state will be protected from incompetent and unqualified practitioners."

Relying upon these admissions, the Supreme Court in *D'Amico II* stated: "[t]his showing in our view demonstrates beyond peradventure of a doubt that there exists no rational relationship between the protection of the public health and the exclusion from licensure of all medical practitioners who have received their training in an osteopathic rather than an allopathic college and hold D.O. rather than M.D. degrees.

"  .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"For the foregoing reasons we hold that the 1962 enactments, *insofar* as they forbid the licensure of graduates of osteopathic colleges as physicians and surgeons in this state regardless of individual qualifications, deny to plaintiffs the equal protection of the laws guaranteed by our state and federal Constitutions and are therefore *to that extent* void and of no effect. Accordingly, as the trial court determined, plaintiffs are entitled to be considered for licensure, either as 'new' physicians and surgeons or on the basis of reciprocity, *according to the provisions of the Osteopathic and Medical Practice Acts which were applicable immediately prior to the 1962 amendments.*" (Italics added.) (*D'Amico II, supra,* p. 24.)

The Osteopathic Act which was applicable immediately prior to the 1962 amendments was the Osteopathic Act of 1922. And with the filing of the *D'Amico II* opinion, new osteopaths again began to be licensed by and came under the jurisdiction of the Osteopathic Board.

As is apparent from this chronology, *D'Amico II* had not been decided at the time that SB 1358 was passed. Dr. Stanley Mertes, an osteopath for whose benefit SB 1358 was passed, was practicing medicine on a federal enclave in California as an employee of the Department of the Navy. Faced with the closure of that federal facility, he had no way to become licensed in California to practice medicine. So while D'Amico and others sought to remedy the situation through the courts, Dr. Mertes pursued a legislative solution.

The trial court ruled SB 1358 null and void because the 1922 Osteopathic Act (considered by the trial court as the only applicable law on the subject after *D'Amico II*) precluded the Legislature from authorizing the Medical Board to exercise jurisdiction over graduates of osteopathic schools. There is no doubt that this is the effect of the 1922 Osteopathic Act. By its terms it states that the "board of medical examiners of the State of California shall have no further jurisdiction, duties or functions with respect to graduates of osteopathic schools . . . ." (Deering's Bus. & Prof. Code, App. II, § 2 [West's, Bus. & Prof. Code, § 3600-2]), and it was so held in *Gamble* v. *Bd. of Osteopathic Examiners* (1942) 21 Cal.2d 215 [130 P.2d 382], and *Bartosh* v. *Bd. of Osteopathic Examiners* (1947) 82 Cal.App.2d 486 [186 P.2d 984]. It is equally clear that the 1922 act can only be amended by another initiative measure, because it does not provide for amendment by the Legislature. (See Cal. Const., art. IV, § 24(c).)[6] ■ Since SB 1358 was not an initiative measure, it was validly enacted only if the authority to amend granted to the Legislature by the 1962 act[7] has survived *D'Amico II's* holding of unconstitutionality. Has it done so? Resolution of the question depends necessarily upon a determination of what, if anything, remains of the 1962 act after the *D'Amico II* decision.

As we read the language of *D'Amico II,* considering it also in the context of that litigation, the Supreme Court did not rule the entire 1962 act unconstitutional. In stating its holding as set out above, the court ruled that *"insofar as"* the 1962 enactments forbid licensure of new osteopathic school graduates, such enactments are *"to that extent"* void. The court was fully aware of the other provisions of the 1962 act, including those which permitted the holders of D.O. degrees to elect to use the term M.D. and thereby to be regulated by the Board of Medical Examiners. Although this subject may not have been expressly argued before the Supreme Court, we do not lightly assume that the Supreme Court intended to cast these doctors into an uncertain limbo without at least a footnote reference to this consequence.

[6]"The Legislature may amend or repeal referendum statutes. It may amend or repeal an initiative statute by another statute that becomes effective only when approved by the electors *unless the initiative statute permits amendment or repeal without their approval.*" (Italics added.)

[7]Section 4 of the 1962 initiative measure reads in pertinent part: "This act, as amended, may be further amended or modified by the Legislature. In addition to such power to amend or modify, the Legislature shall have the power to repeal this act, as amended, in its entirety, and transfer any or all of its functions to the Board of Medical Examiners, in the event that the number of persons who are subject to the jurisdiction of the Board of Osteopathic Examiners reaches 40 or less."

Respondents argue that the provisions of the 1962 act are not severable, and urge us to examine them in light of the standard tests of severability. (See *Leaming* v. *Municipal Court* (1974) 12 Cal.3d 813 [117 Cal.Rptr. 657, 528 P.2d 745], and cases cited.) Indeed we do so. "'Whether a statute containing an unconstitutional provision, with others which are constitutional, will be sustained as to those which are constitutional and held invalid merely as to those which are not, depends upon the nature of the different provisions in view of the evident purpose of the legislature. ▮ If the provisions are so interdependent that those which are invalid are to be regarded as the condition or consideration upon which others were enacted, and it is evident that the legislature would not have enacted the statute except in its entirety, and did not intend that any part should have effect unless the whole could be made operative, the entire stature must be held invalid. On the other hand, if the different parts of the statute are severable and independent of each other, and the provisions which are within the constitutional power of the legislature are capable of being carried into effect after the void part has been eliminated, and it is clear from the statute itself that it was the intent of the legislature to enact these provisions irrespective of the others, the unconstitutional provisions will be disregarded and the statute read as if these provisions were not there,' *(Hale* v. *McGettigan* (1896) 114 Cal. 112, 119 [45 P. 1049]; accord, *People* v. *Barksdale* (1972) 8 Cal.3d 320, 333 [105 Cal.Rptr. 1, 503 P.2d 257]; *People* v. *Navarro* (1972) *supra,* 7 Cal.3d at p. 260.)" Severance is not proper if its consequences would be " 'to accomplish a purpose which the lawmaking power never intended or where the legislative intent is doubtful,' *(Robert* v. *Police Court* (1950) 148 Cal. 131, 135 [82 P. 838]; accord, *O'Kane* v. *Catuira* (1963) 212 Cal.App.2d 131, 141 [27 Cal.Rptr. 818, 94 A.L.R.2d 487].)"

▮ Applying the foregoing analysis to the matter before us, we note the interesting manner in which the elimination of future osteopaths was to be accomplished by the 1962 enactments. The initiative measure contains but five dispositive sections. The first simply repeals section 2 of the 1922 act (which authorized the Osteopathic Board to license and supervise graduates of osteopathic schools). The second provides that the Osteopathic Board shall enforce certain portions of the Medical Practice Act (arts. 12, 13 & 14, ch. 5 of div. 2 of the Bus. & Prof. Code, fn. 5, *ante* p. 81) as to osteopaths (same as before), except that osteopaths who choose to become M.D.s pursuant to section 2396 of the Business and Professions Code shall thenceforth come under the jurisdiction of the

Medical Board. Sections 3 and 5 deal only with the name of the act. And section 4 provides for amendment or modification by the Legislature.

Section 2396 of the Business and Professions Code referred to in the 1962 initiative was enacted by the Legislature prior to the special election which approved the initiative (signed by the Governor on April 23, 1962). As above noted, it provides for the lawful use of the term "M.D." by osteopaths who elect to do so before December 31, 1962.

Section 2451.3 of the Business and Professions Code was enacted by the Legislature at the same time as section 2396 and provides for Medical Board renewal of the D.O. certificates of osteopaths who chose to be designated M.D.s under section 2396. This section expressly directs that it will be effective only if the initiative measure of 1962 is approved by the people.

Thus the initiative measure at once dovetailed with' and gave efficacy to two previously enacted legislative statutes, neither of which would have been valid without the authority granted by section 4. Irrespective of whatever else it did, the measure certainly intended to validate sections 2396 and 2451.3; the voters' attention was directed to this fact and also to the fact that future amending or modifying legislative statutes might be forthcoming. The grant to the Legislature of this power to amend or modify the Osteopathic Act was a vital segment of the initiative measure.

The 1962 measure in essence had the evident purpose of accomplishing three things. First, it removed from the Osteopathic Board (by repealing former § 2) the power to issue and administer osteopathic licenses, except to existing osteopaths. Second, it placed osteopaths choosing to become M.D.s under the jurisdiction of the Medical Board. Third, it gave the Legislature power to amend or modify the Osteopathic Act. The constitutional defect revealed in *D'Amico II* nullified only the first of these objectives. In mechanical terms, the defect abrogated the 1962 law's attempt to repeal section 2 of the 1922 act, thus restoring the latter to full operative vigor. The net effect was a renewal or reaffirmation of the Osteopathic Board's authority to license new osteopathic graduates. Otherwise the provisions of the 1962 measure remained logically operative, particularly as to those former osteopaths who became M.D.s. The three purposes thus are not interdependent upon each other; the people would have enacted the 1962 measure even

without the portion thereof which precluded licensing of new osteopaths; and the severance does not "accomplish a purpose which the lawmaking power never intended." *(Robert* v. *Police Court, supra; Hale* v. *McGettigan, supra.)*

We therefore hold that section 4 of the 1962 initiative measure is valid and operative; it follows that SB 1358 is a valid statute, enacted by the Legislature pursuant to its authority. It amended the "Osteopathic Act" (the 1922 act as modified by the 1962 Act) to provide for licensing of new osteopaths under specified conditions.

■ Respondents further argue that SB 1358 is invalid as an amendment to the Osteopathic Act because it was improperly titled. The bill was entitled: "An Act Relating to the Practice of Medicine." California Constitution, article IV, section 9 provides: "A statute shall embrace but one subject, which shall be expressed in its title. If a statute embraces a subject not expressed in its title, only the part not expressed is void. A statute may not be amended by reference to its title. A section of a statute may not be amended unless the section is re-enacted as amended."

The purpose of this constitutional provision is to prevent legislators and the public from being misled by a mislabeled statute. *(County of Los Angeles* v. *Hurlbut* (1941) 44 Cal.App.2d 88 [111 P.2d 963]; *Ex parte Liddell* (1892) 93 Cal. 633 [29 P. 251].) Respondents claim that the title was misleading in that it did not convey an attempt to amend the Osteopathic Act. They assert that use of the term "osteopath" in some form was necessary for clarification. We disagree. One of the major accomplishments in the extended litigation outlined herein has been to establish firmly that osteopathy constitutes the practice of medicine. Stating the subject matter of the statute broadly, rather than narrowly, in no way makes the title misleading.

The judgment is reversed.

Friedman, Acting P. J., and Janes, J., concurred.

A petition for a rehearing was denied December 4, 1975, and respondents' petition for a hearing by the Supreme Court was denied January 14, 1976.